## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| VALERIE N. GENTRY, | ) | CASE NO. 5:23-CV-00278-SL |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | SARA LIOI |
| | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

### I.       INTRODUCTION

Plaintiff Valerie N. Gentry ("Ms. Gentry") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (ECF Doc. 1). U.S. District Judge Sara E. Lioi has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

### II.      PROCEDURAL HISTORY

On April 4, 2018, Ms. Gentry filed applications for DIB and SSI, alleging a disability onset date of October 20, 2017. (Tr. 578-601.)[1] Ms. Gentry's applications relate to cervical and lumbar spine degenerative disc disease, depression, posttraumatic stress disorder, anxiety disorder, substance abuse disorder, substance induced psychotic disorder, attention deficit hyperactivity

---

[1] The administrative transcript ("Tr.") appears at ECF No. 6 on CM/ECF.

disorder, tobacco use disorder, Methicillin-resistant Staphylococcus aureus ("MRSA"), autoimmune thyroiditis/Grave's disease, migraines, cellulitis, preverterbral abscess, vertigo, neurodermatitis, chronic obstructive pulmonary disease ("COPD"), gastroesophageal reflux disease ("GERD"), and asthma. (Tr. 112.)   Her applications were denied initially and upon reconsideration. (Tr. 326-39, 340-52.) Ms. Gentry requested a hearing before an administrative law judge ("ALJ"). (Tr. 353-54.) An ALJ held a telephone hearing due to the COVID-19 pandemic on January 10, 2020. (Tr. 194-223.) Ms. Gentry, represented by counsel, and a vocational expert ("VE") testified at the hearing. (*Id.*) The ALJ issued a written decision on April 14, 2020, finding Ms. Gentry was not disabled under the meaning of the Social Security Act. (Tr. 294-314.)

Ms. Gentry requested a review with the Appeals Council on May 29, 2020. (Tr. 406-08.) The Appeals Council remanded the case back to the ALJ on February 22, 2021. (Tr. 315-21.) On June 1, 2021, an ALJ held a remand hearing. (Tr. 153-88.) The ALJ issued a written decision on September 29, 2021, finding Ms. Gentry was not disabled under the meaning of the Social Security Act. (Tr. 106-29.)

Ms. Gentry again filed a request for a review of the ALJ's decision with the Appeals Council (Tr. 564-66), which the Appeals Council granted on October 14, 2022 (Tr. 567-77). On December 14, 2022, the Appeals Council issued a written decision finding Ms. Gentry not disabled. (Tr. 3-16.) The Appeals Council's decision is the "final decision" of the Commissioner subject to judicial review. 20 C.F.R. §§ 404.900(a)(5), 416.1400(a)(5).

Ms. Gentry filed a Complaint challenging the Commissioner's final decision on February 13, 2023. (ECF No. 1.) She raises the following assignments of error:

(1) The ALJ and AC found at Steps Four and Five of the Sequential Evaluation that Plaintiff could frequently handle, finger, and feel. This was in error as the RFC finding was contrary to the medical evidence in the record.

(2) The ALJ and AC committed harmful error when they failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence, and limiting effects of Plaintiff's symptoms, including pain, precluded her from engaging in substantial gainful activity on a full-time and sustained basis.

(ECF No. 8, PageID#2257.)

## III.    BACKGROUND INFORMATION

### A.    Personal, Educational, and Vocational Experience

Ms. Gentry was born in 1980, and she was 37 years old on the alleged disability onset date. (Tr. 118.) She lives with her daughter and aunt. (Tr. 165.) She graduated from high school. (Tr. 166.) Her past relevant work was employment as a deli cutter/slicer, an assistant manager, and a floral merchandiser. (Tr. 118.)

### B.    Relevant Hearing Testimony

#### 1.    *Ms. Gentry's Testimony*

##### a.    June 2021 Hearing

Ms. Gentry testified that she last worked in 2017. (Tr. 160.) At the time of the hearing, she was residing at an addiction treatment center in lieu of a conviction for a charge for possession of methamphetamine. (Tr. 164-65.) She stated at the hearing that she was no longer driving because her arm previously became numb while driving, and she hit an electrical pole. (Tr. 165-66.) She testified that her arms prevent her from picking things up. (Tr. 166.) She testified that her ability to use her arms depends on the day, explaining that how she slept the night before influences how her arm feels. (Tr. 167.) Ms. Gentry stated that she experiences issues with her arms about every day. (*Id.*) She said that she can only lift 10 pounds. (Tr. 169.) Ms. Gentry testified that her arms drops when she carries things. (Tr. 170.) She stated that she drops things as her arms release without warning. (*Id.*) She testified that she experiences pain in her back that feels tight and tense.

(*Id.*) She also experiences physical problems in her lower back, such as issues bending down, picking things up, and putting on her pants. (*Id.*)

While Ms. Gentry testified that she stopped going to the doctor because she could no longer afford the bills, she also testified that she has health insurance. (Tr. 167.) She used to exercise daily at the gym in 2019 but stopped going because she could no longer afford it. (Tr. 169.) She stated that she now exercises at the park. (*Id.*)

Ms. Gentry also testified that she has problems with her breathing. (Tr. 171.) She attributed these breathing problems to the season. (*Id.*) She stated that she uses an inhaler three times a day and an aerosol machine every other month. (*Id.*) She smokes half a pack of cigarettes a day. (Tr. 173.) She drinks alcohol once or twice a month. (*Id.*)

Ms. Gentry also discussed her problems with depression and anxiety. She stated that she has "terrible" anxiety, and that she takes hydroxyzine to treat this condition. (Tr. 172.) She stated that she does not find hydroxyzine to be as effective as her previous medications, and she experiences drowsiness as a side effect of hydroxyzine. (Tr. 176.) She testified that she has been depressed because she "can't seem to find something that [she is] good at doing." (Tr. 172.) She reported that she last used drugs at least six months prior to the June 2021 hearing. (Tr. 174.) She testified that she has a problem with depression, not drugs. (Tr. 175.)

### b.  September 2021 Hearing

On September 16, 2021, the ALJ held another hearing after he arranged for Ms. Gentry to attend a consultative examination. (Tr. 134.) Ms. Gentry stated that she was unable to work due to repetitive issues with carrying heavy items and dropping those items without warning. (Tr. 141-42.) She testified that her legs buckle and then her arms will drop items without warning. (Tr. 142.) She stated that she can lift 10 to 15 pounds and, if working out, 5 to 10 pounds repetitively. (Tr.

143.) She stated that her right arm is the "worse arm," and she cannot do tasks such as crafts or writing. (Tr. 144.) She testified that she can walk long distances, though her leg recently started to buckle and she fell twice in the week prior to the hearing. (*Id.*)

Ms. Gentry testified that she was still experiencing problems with anxiety. (Tr. 144.) She stated that she wants to address her anxiety through artistic avenues such as crafts and writing, but her arm prevents her from doing so because it "just won't work" or it "just freezes up." (*Id.*) Due to issues with her arm, she described her anxiety as a 15 out of 10. (*Id.*) She has been trying to address her anxiety by exercising and seeing a psychiatrist. (Tr. 144-45.)

Ms. Gentry testified that she has breathing problems related to her asthma and COPD. (Tr. 145.) She stated that she smokes approximately five cigarettes a day (*id.*) and was abstaining from alcohol and drugs. (Tr. 145-46.)

### 2. *Vocational Expert's Testimony*

#### a. June 2021 Hearing

The ALJ asked the VE whether a hypothetical individual with Ms. Gentry's age, education, and experience could perform work at the light exertional level, if additionally limited to frequently pushing and pulling with her bilateral upper extremities; never climbing ladders, ropes, or scaffolds; occasionally climbing ramps or stairs; frequently balancing; frequently stooping, kneeling, crouching, and crawling; occasionally reaching overhead bilaterally; frequently handling and fingering objects bilaterally; frequently feeling objects bilaterally; never using moving machinery; never being exposed to unprotected heights; and never performing commercial driving. (Tr. 181.)[2] The VE opined that this individual could not perform past relevant work but could perform work as a housekeeping cleaner, merchandise marker, and routing clerk. (Tr. 182.)

---

[2] Because Ms. Gentry does not oppose the mental limitations, this summary only includes the physical limitations from the hypothetical.

The ALJ then limited the hypothetical individual to the same limitations as the first hypothetical, except the individual could occasionally stoop, kneel, and crouch; never crawl; and could have occasional concentrated exposure to fumes, odors, dusts, gases, and poorly ventilated areas. (Tr. 182-83.) The VE opined that this individual could still perform the same jobs from the first hypothetical. (Tr. 183.)

The ALJ then asked if the individual from the second hypothetical could perform work if additionally limited to occasionally lifting up to 10 pounds and occasionally pushing and pulling with the bilateral upper extremities. (Tr. 183.) The VE stated that this individual would be limited to work at the sedentary exertional level, and could perform employment as a document preparer, cutter and paster for press clippings, and addresser. (*Id.*)

The ALJ also asked if there would be jobs available for the person from the third hypothetical if this person also could only stand/walk for two hours a day. (Tr. 183-84.) The VE opined that the previously stated jobs would still be available at the sedentary exertional level. (Tr. 184.) The VE also stated that the tolerance for off-task behavior would be 10%. (*Id.*)

Ms. Gentry's counsel asked the VE whether there would be jobs available if the hypothetical individual were limited to occasional reaching and handling. (Tr. 184-85.) The VE stated that there would be no sedentary jobs available, but there would be light jobs available as a counter clerk, tanning salon attendant, and furniture rental clerk. (*Id*.) Ms. Gentry's counsel asked the VE about the tolerance for absenteeism, and the VE responded that the tolerance for absenteeism was six to eight days a year. (Tr. 185.)

**b. September 2021 Hearing**

The ALJ first asked the VE whether an individual with Ms. Gentry's age, education, and experience could perform work at the light exertional level if limited to frequently pushing and

6

pulling with her bilateral upper extremities; never climbing ladders, ropes, or scaffolds; occasionally climbing ropes or stairs; frequently balancing, stooping, kneeling, crouching, and crawling; occasionally reaching overhead bilaterally; frequently handling and fingering objects bilaterally; frequently feeling bilaterally; never using moving machinery; never be exposed to unprotected heights; never performing commercial driving. (Tr. 148.) The VE opined that the individual could not perform past relevant work but could perform work as a routing clerk, mail clerk, or merchandise marker. (Tr. 149.)

The ALJ then asked the VE whether the individual from the first hypothetical could perform if limited to occasionally lifting up to ten pounds; occasionally pushing and pulling with her bilateral upper extremities; occasionally stooping, kneeling, and crouching; never crawling; and could have occasional concentrated exposure to fumes, odors, dusts, and gases in poorly ventilated areas. (Tr. 149-50.) The VE stated that the individual could perform work as a mail clerk, addresser, and photocopying machine operator. (Tr. 150.)

The ALJ next asked the VE whether the same individual from the second hypothetical could perform work if the individual also could stand and walk for two hours in an eight-hour workday and sit for six hours in an eight-hour workday. (*Id.*) The VE opined that this individual could work as an addresser. (Tr. 150-51.)

The ALJ asked the VE, considering all the jobs without any of the limitations, whether an individual could perform if they hypothetical individual could only occasionally handle and finger objects. (Tr. 151.) The VE opined that this would eliminate all jobs. (*Id.*) The ALJ also asked the VE an employer's tolerance for off-task behavior. (*Id.*) The VE opined that the tolerance for off-task behavior would be 10%. (*Id.*)

**C.  Relevant Non-Medical/Medical Opinion Evidence**

**1.  *State Agency Physical Consultants' Opinions***

In July 2018, Leslie Green, M.D., reviewed Ms. Gentry's record at the initial level of consideration. Dr. Green opined that Ms. Gentry could perform at the light exertional level. Specifically, Dr. Green opined that Ms. Gentry could occasionally lift and/or carry 20 pounds, frequently lift 10 pounds, stand and/or walk with normal breaks for about 6 hours in an 8-hour workday, and could push and/or pull without limitations. (Tr. 235.) Dr. Green further opined that Ms. Gentry could occasionally climb ramps/stairs; climb ladders/ropes/scaffolds; balance occasionally; stoop occasionally; kneel occasionally; crouch occasionally; and crawl occasionally. (Tr. 235-36.) Dr. Green did not find that Ms. Gentry had any manipulative, visual, communication, and environmental limitations. (Tr. 236.)

David Knierim, M.D., reviewed the record at the reconsideration level in October 2018. (Tr. 270.) Dr. Knierim generally had the same opinions as Dr. Green, but he added manipulative and environmental limitations. Specifically, Dr. Knierim added that Ms. Gentry should be limited to occasionally reaching overhead and frequent handling, fingering, and feeling. (Tr. 269.) In addition, Dr. Knierim opined that Ms. Gentry should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and avoid all exposure to hazards. (Tr. 270.)

**2.  *Hunter Sussky, PT***

In June 2018, PT Sussky conducted a functional capacity evaluation of Ms. Gentry. (Tr. 1394-1400.) PT Sussky concluded that Ms. Gentry could perform job activities such as occasionally lifting up to 30 pounds; sitting occasionally, standing and walking constantly, frequently reaching and reaching overhead; occasionally pushing/pulling, bending, kneeling, and stooping. (Tr. 1396-98.) PT Sussky observed that Ms. Gentry's heart rate did not increase in a

relational manner to her subjective reports of pain and difficulty of testing. (Tr. 1394.) PT Sussky concluded that despite the possibility of "inconsistent and unreliable effort" from Ms. Gentry, Ms. Gentry could work with the previously mentioned limitations. (*Id.*) However, PT Sussky also noted that Ms. Gentry may be able to complete more intense job demands, though he could not speculate upon more intense job demands due to Ms. Gentry's self-termination of activity. (*Id.*)

### 3. *Cheryl Benson-Blankenship, Ph.D.*

In July 2018, Ms. Gentry underwent a psychological consultative examination with Dr. Benson-Blankenship. Upon mental status examination, Ms. Gentry was well groomed, cooperative, and not suicidal or homicidal. (Tr. 1405-06.) Ms. Gentry described her mood as "okay" and had congruent affect. (Tr. 1406.) Ms. Gentry had no evidence of any delusional processes, was not suicidal or homicidal, and had no evidence of tangential or circumstantial speech. (Tr. 1407.) She was able to remember past events of her life situation but had difficulty with specific dates related to her personal history. (*Id.*) Regarding her activities of daily living, Ms. Gentry reported that she gets her daughter ready for school, washes herself twice a day, cleans, shops for groceries, and cooks for herself and her daughter. (*Id.*) She reported that she can handle her money and does not need any assistance with self-care. (*Id.*) Dr. Benson-Blankenship diagnosed Ms. Gentry with a history of polysubstance abuse in self-reported remission, tobacco use disorder, and generalized anxiety disorder. (Tr. 1408.)

With respect to Ms. Gentry's abilities and limitations in understanding, remembering, and carrying out instructions, Dr. Benson-Blankenship assessed that Ms. Gentry could be expected to understand and apply instructions consistent with average intellectual functioning. (*Id.*) Regarding Ms. Gentry's abilities and limitations in maintain attention, concentration, persistence, and pace to perform simple and multi-step tasks, Dr. Benson-Blankenship observed that Ms. Gentry

reported an "uneventful number of years" at a previous job and was able to track and follow conversation adequately at the examination. (*Id.*) Regarding Ms. Gentry's abilities and limitations in responding appropriately to supervision and coworkers in a workplace setting, Dr. Benson-Blankenship opined that Ms. Gentry had no limitations in her ability to conform to social expectations in a work-related setting. (*Id.*) Finally, with respect to Ms. Gentry's abilities and limitations in responding appropriately to workplace pressures in a workplace, Dr. Benson-Blankenship noted that Ms. Gentry currently dealt with stress and pressure by being around her daughter and being at home. (*Id.*) Dr. Benson-Blankenship also noted that Ms. Gentry has no reported history of mental or emotional deterioration in workplace exposure. (*Id.*)

### 4.  *Christopher D'Amico, D.O.*

In June 2021, Ms. Gentry attended an internal medicine consultative examination with Dr. D'Amico. Ms. Gentry reported applying for disability benefits due to breathing problems, back and neck problems, and MRSA. (Tr. 2210.) She stated that she has a history of back and neck problems since childhood caused by scoliosis, her current pain level was 6 out of 10, and her treatment methods included physical therapy sessions and diagnostic studies such as MRIs and x-rays, along with surgery for cervical hardware removal in 2018. (*Id.*)  She also reported a history of MRSA infection after a surgery fusion, which she alleged affected her ability to work secondary to difficulty walking and holding her head in one position. (*Id.*) Regarding substance issues, Ms. Gentry reported that she was not currently using recreational drugs and had a history of smoking one pack of cigarettes per day and drinking alcohol once per month. (Tr. 2211.) Upon physical examination, Ms. Gentry was able to lift, carry, and handle light objects; her reflexes were symmetric; a sensory examination was normal to light touch throughout; and a straight leg raise test was negative bilaterally. (Tr. 2212.) In addition, Ms. Gentry had a steady and symmetric gait,

10

did not use an assistive device, was able to rise from a sitting position without assistance, could get up and down from the exam table with ease, and had no joint swelling, effusion, erythema, tenderness, or deformity. (*Id.*) Based on these findings and Ms. Gentry's reports, Dr. D'Amico assessed Ms. Gentry with the following probable diagnoses: low back pain – status post surgery – probable laminectomy, cervicalgia status post fusion, bilateral upper extremity paresthesia, Hashimoto's, Graves' disease, scoliosis, degenerative disease, thoracic outlet syndrome, asthma, amblyopia, and unspecified mood disorder. (Tr. 2212-13.)

Dr. D'Amico determined that Ms. Gentry has mild limitations with sitting, standing, and walking due to low back pain, cervicalgia, and upper extremity paresthesia. (Tr. 2213.) Dr. D'Amico opined that Ms. Gentry had mild limitations with lifting and carrying weight due to low back pain, cervicalgia, and upper extremity paresthesia. (*Id.*) Dr. D'Amico assessed that Ms. Gentry had limitations with bending, stooping, crouching, and squatting, and that Ms. Gentry would be able to perform these actions occasionally due to low back pain, cervicalgia, and upper extremity paresthesia. (*Id.*) Finally, Dr. D'Amico opined that Ms. Gentry had limitations on reaching, grasping, handling, fingering, and feeling, and that Ms. Gentry will be able to perform these actions occasionally due to cervicalgia and upper extremity paresthesia. (*Id.*)

### D.  Relevant Medical Evidence[3]

Ms. Gentry has the severe impairments of cervical and lumbar spine degenerative disc disease, depression, posttraumatic stress disorder, anxiety disorder, substance abuse disorder, substance induced psychotic disorder, and attention deficit hyperactivity disorder. (Tr. 112.) She

---

[3] The Commissioner's "Statement of Relevant Facts" states that the relevant evidence and hearing testimony are "set forth more fully in the ALJ's decision…and the Appeals Council's decision." (ECF No. 10, PageID#2286.) The Commissioner directs this Court to the specifically analyzed facts in its "Argument" section. (*Id.*) This Court reminds the Commissioner, however, that the Standing Order instructs the parties that "[a]ll facts relevant to the legal issues and discussion must be set forth in the 'Facts' section." (ECF No. 5, PageID#26.)

also has been diagnosed with tobacco use disorder, MRSA, autoimmune thyroiditis/Grave's disease, migraines, cellulitis, preverterbral abscess, vertigo, neurodermatitis, COPD, GERD, and asthma. (*Id.*)

### 1. *Physical Conditions*

From October 25 to 26, 2017, Ms. Gentry was admitted to the hospital for C5-7 anterior cervical decompression and fusion surgery due to cervical degenerative disc disease and cervical radiculopathy. (Tr. 889-90.) Ms. Gentry was hospitalized from February 13 to February 21, 2018, due to a wound infection in the left temporal lobe and left second toe. (Tr. 917.) She received treatment for MRSA bacterium. (Tr. 936.) Her drug screen was positive for amphetamines. (*Id.*) On February 15, 2018, Ms. Gentry received surgery that removed the anterior plate at the C4 through C6 vertebrae and washout of prevertebral abscess. (Tr. 1051-52.) From February 21 to March 28, 2018, Ms. Gentry was hospitalized for ongoing IV antibiotics for her neck abscess. (Tr. 1136.37.) The medical provider assessed Ms. Gentry with facial cellulitis/left neck abscess, history of chronic pain syndrome secondary to degenerative disc disease, with a history of both cervical and lumbar surgeries, and remote history of crystal meth use. (Tr. 1137.)

On April 3, 2018, Ms. Gentry attended a follow-up pain management appointment for her lower back pain and neck pain. (Tr. 1179.) She reported that her lower back pain was stable. (*Id.*) Neck pain continued to be her primary complaint. (*Id.*) She denied evolving lower extremity numbness, weakness, or radicular pain. (*Id.*) Numbness in her hands had improved, but she reported generalized weakness in her upper extremities. (*Id.*) She completed antibiotic therapy. (*Id.*)

On May 24, 2018, Ms. Gentry obtained x-rays of her lumbar spine based on a history of spondylosis without myelopathy, which revealed mild to moderate lower lumbar degenerative disc

disease. (Tr. 1565.) On June 1, 2018, Ms. Gentry's chief complaint was sensory loss/abnormality, neck pain, and hand numbness/tingling. (Tr. 1415.) Upon cervical spine examination, Ms. Gentry's cervical spine was normal to inspection and palpation, and she was able to touch her chin to her chest. (Tr. 1416.) She also demonstrated steady gait. (*Id.*) She also was oriented to person, place, and time, and moved all her extremities. (*Id.*)  In July 2018, Ms. Gentry obtained an MRI of the cervical spine based on a history of neck pain and spinal stenosis, which revealed postoperative changes and multilevel cervical spondylosis, and there was no significant central stenosis throughout the cervical spine. (Tr. 1568.) She had multilevel degenerative neural foraminal narrowing secondary to uncinate hypertrophy, including moderate narrowing at the right CR-C4 level and moderate narrowing at the right C5-C6 level. (*Id.*)

On September 12, 2018, Ms. Gentry attended a follow-up appointment. Upon physical examination, Ms. Gentry had no edema, normal reflexes, and no tremor. (Tr. 1503.) On December 12, 2018, Ms. Gentry demonstrated normal range of motion in all her joints; no clubbing, cyanosis, or edema in her extremities; and no costovertebral angle tenderness and no rash in her back. (Tr. 1626.) Her neurologic exam demonstrated that she was alert and oriented times three and had no focal signs. (*Id.*)

On January 2, 2019, Dr. Yonatan Spolter examined Ms. Gentry for her complaints of numbness and tingling. (Tr. 2188-92.) Dr. Spolter noted that Ms. Gentry had numbness, tingling, and episodic weakness in her bilateral upper extremities. (Tr 2192.) Dr. Spolter further noted that Ms. Gentry's symptoms were "likely residual" from prior and ongoing cervical radiculopathy, but also stated that upon examination she had no muscle weakness and normal reflexes. (*Id.*) Dr. Spolter also assessed that Ms. Gentry had chronic neck and lower back pain. (*Id.*) Upon physical examination, Ms. Gentry's musculoskeletal system had normal bulk and tone throughout. (Tr.

2191.) She had decreased sensation to pinprick throughout her bilateral arms in all dermatological distributions and normal vibration in her bilateral lower extremities. (Tr. 2191.) She had normal gait. (*Id.*)

On February 7, 2019, Ms. Gentry underwent a nerve conduction study. The "Impression" section of the study noted chronic radiculopathy without active denervation in her right upper extremity. (Tr. 1634.) This section also noted that Ms. Gentry had no evidence of cervical radiculopathy in her left upper extremity. (*Id.*)

On October 16, 2020, Ms. Gentry went to James Johnston, D.O., with complaints of neck pain and dizziness lasting "for weeks." (Tr. 2194.) Dr. Johnston observed, upon examination of Ms. Gentry, that she was alert and oriented; had vertigo and associated nausea; had breathing clear to auscultation with no wheezes, rhonchi, and rales; had no edema; had areas of skin breakouts that appeared to be neurodermatitis; had no motor/sensory deficit; and had no tremor. (Tr. 2195.)

On July 17, 2021, Ms. Gentry attended an internal medicine consultative examination with Dr. Christopher D'Amico. (Tr. 2210-18.) Dr. D'Amico recommended a functional capacity evaluation. (Tr. 2113.) Dr. D'Amico's findings are summarized in the "Relevant Non-Medical/Medical Opinion Evidence" section of this Report and Recommendation.

### 2. *Mental Conditions*

On July 31, 2018, Ms. Gentry attended an adult DSM diagnostic assessment with Mr. Blaine Muehlbauer. At this assessment, Ms. Gentry reported that she felt very anxious lately and had a history of trauma, including her ex-boyfriend attempting to murder her and likely being sexually abused when she was younger. (Tr. 2151.) Upon mental status examination, Ms. Gentry demonstrated an average demeanor, no evidence of hallucinations or delusions, clear speech, average eye contact, and no current suicidal or homicidal ideation, intent or plan. (Tr. 2154.) In

addition, Ms. Gentry had a euthymic mood with full affect; exhibited cooperative behavior; was alert and oriented to all spheres; and had fair to good insight and judgment. (Tr. 2155.) Based on these findings, Mr. Muehlbauer diagnosed Ms. Gentry with PTSD, alcohol use disorder in early or sustained remission, opioid use disorder in early or sustained remission, and amphetamine-type substance use disorder in early or sustained remission. (Tr. 1525, 2164.)

Ms. Gentry began counseling with Mr. Muehlbauer on August 20, 2018. (Tr. 1527-30.) Mr. Muehlbauer noted that Ms. Gentry continued to experience chronic pain from her neck injury, which interferes with her ability to exercise, a previously helpful activity. (Tr. 1528.) She experiences pain attacks, but is "unclear about precipitants." (*Id.*) Mr. Muehlbauer noted that one stressor is a financial one related to her daughter's father planning to quit his job. (*Id.*)

Ms. Gentry attended another counseling appointment on August 29, 2018. Mr. Muehlbauer noted that Ms. Gentry exercises daily, which helped her to feel better physically. (Tr. 1532.) He noted that Ms. Gentry experienced problems from her failed neck surgery and that she was working at caring for herself and maintaining a positive outlook. (*Id.*) He also noted that Ms. Gentry "[f]idgets due to discomfort." (*Id.*)

On September 12, 2018, Mr. Muehlbauer wrote in the "Therapeutic Interventions Provided" section that he and Ms. Gentry "[a]ddressed current functioning." (Tr. 1536.) She processed the impact of MRSA and chronic pain and explored how she manages with this impact primarily through regular exercise. (*Id.*) In the "Response to Intervention/Progress Toward Goals and Objectives," Mr. Muehlbauer noted that Ms. Gentry focused on the potential recurrence of MRSA. (*Id.*)

On November 21, 2018, Ms. Gentry was in the emergency room for one day due to erratic behavior and methamphetamine use. (Tr. 1581-84, 1639.) Ms. Gentry was admitted to a

15

psychiatric hospital from November 27, 2018, to December 3, 2018, for depression, anxiety, and disordered thinking. (Tr. 1552-53.) Her mental diagnoses at discharge were mixed severe bipolar 1 disorder with psychotic features, methamphetamine abuse, and nicotine use disorder. (Tr. 1553.) Ms. Gentry endorsed symptoms such as irritability, dysphoria, problems with attention and concentration, fatigue, guilt, and worthlessness. (Tr. 1583.)

A November 27, 2018, inpatient examination revealed Ms. Gentry had normal behavior, normal judgment, and normal memory and cognition, but she also had anxious mood, tangential speech, active hallucinations, and paranoid thought content. (Tr. 1669.)

A November 30, 2018, inpatient examination revealed Ms. Gentry was awake and alert but was "somewhat disheveled" in clothing and appearance, had difficulty cooperating in the interview due to significant distractibility and inability to focus, was fidgety and restless during the interview, had poor insight, appeared somewhat anxious and nervous during the interview, and claimed current and ongoing suicidal ideation. (*Id.*) She had normal but anxious speech; sad, depressed, and irritable mood with congruent affect; obsessional and racing thoughts; delusional thoughts; and faulty judgment. (Tr. 1583-84.)

At a January 2, 2019, neurology appointment, Ms. Gentry's examination revealed that she was alert and oriented to person, place, and time; had fluent speech without dysarthria or aphasia; recall intact to recent and remote events; intact attention and concentration; and intact fund of knowledge. (Tr. 2191.)

On May 25, 2019, Ms. Gentry returned to the emergency room for suicidal intent, but she was released the same day. (Tr. 1950-57.) On June 17, 2019, Ms. Gentry went to the emergency room for psychosis, but she was released the same day. (Tr. 2133.) At this emergency room visit, Ms. Gentry denied she previously went to the emergency room in May 2019 for suicidal intent and

methamphetamine use. (Tr. 2129.) Upon examination, Ms. Gentry appeared "somewhat agitated" and was fidgeting in her exam bed, but she was following commands and answering questions. (Tr. 2131.) She repeatedly stated someone had stolen her identity. (*Id.*)

On July 30, 2019, Ms. Gentry presented to the emergency room for anxiousness. (Tr. 1964.) Upon examination, Ms. Gentry was anxious with rapid and/or pressured speech but had normal judgment, thought content, cognition, and memory. (Tr. 1969.) On August 10, 2019, Ms. Gentry's psychiatric exam revealed that she had normal mood and affect. (Tr. 1991.)

From August 13, 2019, to August 22, 2019, Ms. Gentry was hospitalized for acute psychosis. (Tr. 2013-14, 2040-46.) She tested positive for amphetamines and oxycodone in the emergency department, but she was vague and evasive about substance use. (Tr. 2040.) The treatment notes stated that Ms. Gentry was "somewhat disorganized in her thinking with poor memory or evasiveness so full/accurate history [of substance use] was difficult to obtain." (*Id.*) At an inpatient examination from August 15, 2019, Ms. Gentry appeared disheveled, unkempt, and a little agitated. (Tr. 2047.) She did not make good eye contact and had dysphoric mood, inappropriate affect, slow speech and thought process, paranoia, and impaired insight and judgment, but she denied any hallucinations or delusions. (*Id.*)

Ms. Gentry again presented to the emergency room on October 22, 2019, for a psychiatric evaluation and depression (Tr. 2091-97.) She was released the same day, and her exam revealed Ms. Gentry had flat affect and was cooperative. (Tr. 2095.)

On August 17, 2020, Ms. Gentry underwent an examination at a gynecology appointment. The objective exam results revealed that Ms. Gentry had normal mood and affect, normal speech, and normal behavior. (Tr. 2198.)

## IV.    THE ALJ'S DECISION

The Appeals Council directed the ALJ to do the following on remand: (1) further evaluate Ms. Gentry's alleged symptoms and provide rationale; (2) give further consideration as to Ms. Gentry's maximum residual functional capacity and provide appropriate rationale, with specific references to evidence in the record in support of assessed limitations; and (3) if Ms. Gentry is found disabled, conduct further proceedings to determine whether drug addiction is a contributing factor material to the determination of disability. (Tr. 109.)

The ALJ, on remand, first determined that Ms. Gentry met the insured status requirements of the Social Security Act through December 31, 2023. (Tr. 111.) The ALJ further determined that Ms. Gentry has not engaged in substantial gainful activity since October 20, 2017, the alleged disability onset date. (Tr. 111-12.) The ALJ then determined that Ms. Gentry has the following severe impairments: cervical and lumbar spine degenerative disc disease, depression, PTSD, anxiety disorder, substance abuse disorder, substance induced psychotic disorder, and ADHD. (Tr. 112.) However, the ALJ found that none of these impairments—individually or in combination— met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 112-13.)

The ALJ further determined that Ms. Gentry could work at the light exertional level, except that she can frequently push and pull with her bilateral upper extremities; can never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; can frequently balance; can frequently stoop, kneel, crouch, and crawl; can occasionally reach overhead bilaterally; can frequently handle, finger, and feel objects bilaterally; and must avoid the use of moving machinery, commercial driving. (Tr. 114.) With respect to non-exertional limitations, the ALJ determined that Ms. Gentry can perform simple, routine, and repetitive tasks; can perform work in a work environment free of

fast-paced production requirements and involves only routine workplace changes; can have occasional public contact; can have occasional interaction with co-workers; and can have superficial contact with others, in that she can do no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others. (Tr. 114-17.)

The ALJ next determined that Ms. Gentry is unable to perform any past relevant work. (Tr. 118.) Considering Ms. Gentry's age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Ms. Gentry could perform, such as employment as a routing clerk, mail clerk, and merchandise marker. (Tr. 118-19.) Accordingly, the ALJ concluded that Ms. Gentry was not disabled within the meaning of the Social Security Act since the application filing date. (Tr. 119.)

## V.     THE APPEALS COUNCIL'S DECISION

Ms. Gentry requested that the Appeals Council review the ALJ's September 2021 decision. (*See* Tr. 103.) On October 14, 2022, the Appeals Council granted Ms. Gentry's request for review. The Appeals Council also notified Ms. Gentry that it would consider a statement about the facts and the law in the case, or additional evidence if the additional evidence met the standard in the notice. (Tr. 6.) Ms. Gentry submitted a statement, which the Appeals Council considered. (*Id.*) Ms. Gentry also submitted additional treatment records, which consisted of: (1) 28 pages of treatment notes from Summa Internal Medicine Center dated February 22, 2022 to May 2, 2022; (2) 15 pages of treatment notes from Coleman Behavioral Health dated February 22, 2022 to May 24, 2022; (3) 30 pages of treatment notes from Coleman Behavioral Health dated November 29, 2020 to February 22, 2022; and (4) treatment notes from Summa Internal Medicine Center dated November 19, 2021. (*Id.*)

19

On December 14, 2022, the Appeals Council issued a decision finding that Ms. Gentry was not disabled. (Tr. 6-13.) The Appeals Council first determined that Ms. Gentry's statement did not provide a basis for changing the ALJ's decision. (Tr. 6.) It then determined that the additional evidence did "not relate to the period at issue" and "[did] not affect the decision about whether [she was] disabled beginning on or before September 29, 2021." (*Id.*) The Appeals Council informed Ms. Gentry that those records could instead be used to support another application for disability. (*Id.*) The Appeals Council then adopted the ALJ's statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, and the evidentiary facts, as applicable. (*Id.*) The Appeals Council also adopted the ALJ's findings or conclusions regarding whether Ms. Gentry is disabled. (*Id.*)

The Appeals Council determined that the ALJ, despite finding Ms. Gentry's COPD to be a non-severe medically determinable impairment, did not assess limitations on pulmonary irritants in the RFC determination. (Tr. 7.) The Appeals Council, however, determined that the evidence of the record did not support limitations for COPD and, even if limitations were added, there would still be work Ms. Gentry could perform. (*Id.*)

The Appeals Council further determined that the ALJ's decision did not adequately discuss Ms. Gentry's substance abuse disorder and substance induced psychotic disorder. (*Id.*) Specifically, the Appeals Council observed that the ALJ incorrectly determined that there was no evidence of psychiatric hospitalization in the record. (Tr. 7-8.) The Appeals Council found, despite the ALJ's failure to address these visits, that Ms. Gentry was not disabled even considering Ms. Gentry's substance abuse disorder and substance induced psychotic disorder. (Tr. 8.) It determined that the ALJ's RFC discussion included adequate consideration of the limitations Ms. Gentry's

20

substance abuse disorder and substance induced psychotic disorder. (*Id.*) It also found that the medical evidence of record did not support more severe limitations. (*Id.*)

The Appeals Council also found that the ALJ's decision did not contain an adequate evaluation of the opinion evidence of the state agency opinions and PT Sussky in assessing the RFC. (Tr. 8-9.) With respect to the state agency opinions, the Appeals Council found that the ALJ did not explain why some of the state agency limitations were not adopted. (Tr. 9.) Specifically, the Appeals Council observed that the state agency consultant found greater limitations than the ALJ, including occasional postural limitations except for never climbing ladders, ropes, or scaffolds and environmental limitations of no concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (*Id.*) The Appeals Council determined, however, that the state agency limitations for pulmonary irritants and manipulative limitations were "not warranted and even if adopted there would be other jobs that [Ms. Gentry] could do." (*Id.*)

Regarding the evaluation of PT Sussky's opinion, the Appeals Council determined the ALJ failed to address PT Sussky's opinion that Ms. Gentry could sit occasionally. (*Id.*) Specifically, the Appeals Council found that PT Sussky's opinion regarding sitting was not consistent with the light RFC determination, and that the decision did not address this inconsistency. (*Id.*) The Appeals Council, however, ultimately determined that the decision's RFC is supported, and the more restrictive parts of PT Sussky's opinion were not persuasive. (Tr. 9-10.0

The Appeals Council also determined that the ALJ's decision did not contain an adequate evaluation of Ms. Gentry's alleged symptoms. (Tr. 10.) The Appeals Council found that, despite Ms. Gentry's allegations of greater limitations, the overall record supports the decision's light RFC determination. (Tr. 10-11.) The Appeals Council thus adopted and affirmed the ALJ's overall findings regarding whether Ms. Gentry was disabled. (*See* Tr. 6, 13.)

21

## VI.     LAW AND ANALYSIS

### A.  <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the

SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

C.  **Analysis**

    1.  ***Substantial Evidence Supports the RFC Limitation that Ms. Gentry Could Frequently Handle, Finger, and Feel.***

Ms. Gentry argues that the ALJ and Appeals Council erred in finding that she could frequently handle, finger, and feel. Specifically, she contends that the RFC's manipulative limitations were erroneous because they were "contrary to the medical evidence in the record." (ECF No. 8, PageID#2268.) Ms. Gentry points to evidence in the record in support of her argument. (*See id.* at PageID#2269-71.) She argues that the ALJ erred by not finding that she had greater manipulative limitations because she "repeatedly and continually complained of problems with her hands and arms" and because her underlying impairments—cervical spine impairment with right upper extremity radiculopathy—were medically determinable. (*Id.*)

The Commissioner disagrees. (ECF No. 10, PageID#2287-90.) The Commissioner contends that the Appeals Council identified substantial evidence in support of the RFC determination. (*Id.* at PageID#2287.) The Commissioner also asserts that Ms. Gentry "attempts to turn the substantial evidence standard on its head by arguing that some alternative interpretation of the record was feasible." (*Id.*) The Commissioner maintains that Ms. Gentry's argument is merely an invitation to reweigh the evidence in her favor. (*Id.*) For the following reasons, the Commissioner's arguments are well-taken.

The Appeals Council did consider Ms. Gentry's allegations about symptoms affecting her upper extremities, including her arm unexpectedly dropping while lifting objects and an inability to perform repetitive actions. (Tr. 10.) The Appeals Council incorporated by reference the ALJ's evaluation of the objective evidence. (*Id.* ("The decision adequately shows the objective medical evidence supports the physical RFC.")) In addition, the Appeals Council specifically addressed this argument and pointed to evidence that undermined Ms. Gentry's allegations. (Tr. 10-11.) The

Appeals Council noted the consultative examiner's findings, which included the opinion that Ms. Gentry had mild limitations with a restriction to only occasional reaching, handling, fingering, and feeling. (Tr. 11; *see* Tr. 2113.)

But the Appeals Council determined that Dr. D'Amico's own findings were not supported. Specifically, the Appeals Council noted that Ms. Gentry's physical, including the use of her hands, strength, and range of motion, was "unremarkable." (Tr. 11; *see* Tr. 2212-18.) Notably, Dr. D'Amico observed that Ms. Gentry's fine and gross manipulative abilities, as well as her gross and dexterous movements, were grossly normal to normal. (Tr. 2212.) The Appeals Council also noted that a 2019 EMG showed right upper extremity radiculopathy without active denervation. (Tr. 11; *see* Tr. 1634.) That same EMG also indicated that Ms. Gentry's left upper extremity showed no evidence of cervical radiculopathy. (Tr. 1634.) The Appeals Council also observed that examinations reflected that Ms. Gentry showed normal extremities, which included no motor/sensory deficit and no tremor. (Tr. 11; *see* Tr. 1503, Tr. 1626, 2191, 2195.) The Appeals Council also discussed findings from an appointment with PT Sussky. (Tr. 11.) PT Sussky stated that Ms. Gentry's heart rate did not increase in a relational manner to subjective reports of pain and difficulty of testing, and that Ms. Gentry may be able to complete more intense job demands – though due to Ms. Gentry's self-termination of activity, he could not speculate upon more intense job demands. (Tr. 1394.)

On reply, Ms. Gentry disputes the ALJ's, the Appeals Council's, and the Commissioner's reliance on the state agency opinion at the reconsideration level that she was only limited to overhead reaching. (ECF No. 11, PageID#2296-97.) She contends that the ALJ's and Appeals Council's decision was not supported by substantial evidence "as the reviewing physician did not have the opportunity to review the objective testing supporting further limitations." (*Id.*)

However, "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision." *Jones v. Colvin*, No. 5:13CV1781, 2014 WL 459812, at *3 (N.D. Ohio Sept. 12, 2014) (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011)). It is proper for the ALJ to rely on the state agency opinions, so long as the ALJ takes into account subsequent evidence and any relevant changes in the claimant's condition. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009); *Brown v. Saul*, No. 1:18-CV-1463, 2019 WL 4039055, at *6 (N.D. Ohio Aug. 27, 2019) ("If an ALJ's decision includes a discussion of medical opinions or other evidence post-dating the State agency opinions, courts will generally find no error as the ALJ adequately reviewed the complete case record.") (collecting cases). Notably, the Appeals Council decision considered the same February 2019 nerve conduction study post-dating the state agency opinion upon which Ms. Gentry and found that this study demonstrated that she could frequently reach, handle, finger, and feel.

Moreover, although the state agency opinion may not have reviewed the nerve conduction study upon which Ms. Gentry relies, this was not the *sole* piece of evidence that the Appeals Council used to reach their conclusion that Ms. Gentry could be limited to frequently handling, fingering, and feeling. Indeed, as demonstrated above, the Appeals Council pointed to other evidence, not just the state agency opinion, in demonstrating why Ms. Gentry should be limited to frequently, handling, fingering, and feeling, and why Ms. Gentry's allegations were not consistent with the record. (Tr. 11.)

Ms. Gentry summarizes evidence that supports her position, but she does not demonstrate how the Appeals Council's findings were not supported by substantial evidence or based on harmful error, or directly address the actual decision rationale. Her argument amounts to an

26

invitation to reweigh the evidence, which the Court cannot do. *See Smith v. Chater*, 99 F.3d 780, 781 (6th Cir. 1996); *see also Delbo v. Comm'r of Soc. Sec.*, No. 1:21-CV-01522, 2022 WL 2530709, at *13 (N.D. Ohio Jul. 7, 1011) ("The fact that [plaintiff] would weigh the evidence differently or that there is record evidence that may support a more restrictive RFC do not serve as grounds for reversal."); *Harrod v. Comm'r of Soc. Sec.*, No. 3:17CV1839, 2018 WL 386987, at *17 (N.D. Ohio Aug. 15, 2018) ("Although Plaintiff clearly believes the ALJ should have assessed more restrictive limitations based on her interpretation of the medical record, that belief does not establish a violation of the substantial evidence standard."); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("Even if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion."). The Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). Accordingly, I recommend that the Court find this argument meritless.

### 2. *The RFC Did Not Account for the Cumulative Effects of Ms. Gentry's Non-Severe and Severe Impairments.*

Ms. Gentry appears to attempt to make a Step Two argument. She argues the following:

> In this matter, the [Appeals Council] addressed each of the ALJ's non-severe impairments and concluded that Plaintiff was not disabled based on each of these impairments individually (Tr. 7-8). These included COPD, substance abuse disorder, and substance induced psychotic disorder. No mention was made regarding Plaintiff's other impairments including MRSA which resulting in surgery and hospitalization from February 13 to March 28, 2018. Yet, the [Appeals Council] erroneously concluded that the record supported the decision's light RFC (Tr. 10.) Neither the ALJ nor AC, however, continued through the Sequential Evaluation and considered any of these additional impairments when forming the RFC.

(ECF No. 8, PageID#2272.)

The Commissioner contends this argument is inconsistent with a "plain reading" of the Appeals Council's and ALJ's decisions. (ECF No. 10, PageID#2291.) The Commissioner construes Ms. Gentry's argument to mean that the ALJ did not consider Ms. Gentry's COPD, substance abuse disorder, or substance-induced psychotic disorder after Step Two of the sequential evaluation process. (*Id.*) The Commissioner maintains Ms. Gentry's argument is conclusory and unclear because she fails to identify what impairments the ALJ and Appeals Council did not consider. I find that the Commissioner's argument is well-taken.

When formulating an RFC, an ALJ "must consider the combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." *Kochenour v. Comm'r of Soc. Sec. Admin.*, No. 3:14-CV-2451, 2015 WL 9258609, at *6 (N.D. Ohio Dec. 18, 2015) (quotations marks and alteration omitted) (citing *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 388 (6th Cir. 2013) ("[T]he ALJ's assessment of residual functional capacity reflects a claimant's functional capacity in light of all his limitations, not just those that are severe."). This standard recognizes that "the definition of a non-severe impairment contemplates that non-severe impairments may very well impose *some* type of limitation on basic work activities" and that "an ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment…does not impose *any* work-related restrictions." *Patterson v. Colvin*, No. 5:14-cv-1470, 2015 WL 5560121, at *4 (N.D. Ohio Sept. 21, 2015) (quoting *Katona v. Comm'r of Soc. Sec.*, No. 14-cv-10417, 2015 WL 87617, at *6 (E.D. Mich. Feb. 27, 2015) (emphasis in original)).

The ALJ found Ms. Gentry had multiple non-severe impairments, including tobacco use disorder, MRSA infection, autoimmune thyroiditis/Grave's disease, migraines, cellulitis, prevertebral abscess, vertigo, neurodermatitis, COPD, GERD, and asthma. (Tr. 112.) The ALJ

expressly stated in his decision that, despite finding these conditions to be non-severe, they were considered "in assessing [Ms. Gentry's] residual functional capacity." (*Id.*) In assessing Ms. Gentry's RFC, the ALJ assessed allegations related to Ms. Gentry's non-severe impairments, including her COPD and asthma. (Tr. 114.) The Appeals Council did not disturb the ALJ's evaluation of Ms. Gentry's non-severe impairments. Instead, the ALJ considered Ms. Gentry's argument that the RFC should have included specific pulmonary limitations in the RFC to account for her non-severe impairment of COPD. (Tr. 7; *see* Tr. 565 (request for review)). The Appeals Council determined that the overall evidence did not support such limitations. (Tr. 7.) And the Appeals Council further concluded that, even if the evidence did support such limitations, this error would be harmless because the VE identified a significant number of jobs that an individual could perform, if in addition to the limitations included in the RFC, someone was further limited to only occasional exposure to fumes, odors, dusts, and gases in poorly ventilated areas. (Tr. 7 (citing Tr. 149-50)).

The Appeals Council also found that the ALJ's decision did not adequately address Ms. Gentry's substance abuse disorder and substance-induced psychotic disorder. (Tr. 7-8.) The Appeals Council addressed Ms. Gentry's psychiatric hospitalization history and determined that she was not disabled "even considering [her] substance abuse disorder and substance induced psychotic disorder." (Tr. 8.) The Appeals Council determined that the ALJ's RFC determination included adequate consideration of the limitations caused by these conditions, and the medical evidence did not support more severe limitations. (*Id.*)

Beyond Ms. Gentry's bare assertion that the ALJ and Appeals Council did not consider her non-severe impairments at Step Two, she makes no meaningful argument. For example, as the Commissioner points out, Ms. Gentry, who is represented by counsel, fails to identify what

additional limitations should have been included in the RFC determination to account for her non-severe impairment. Ms. Gentry's argument is not supported when reading both the ALJ's and Appeals Council's decisions as a whole. Because she does not demonstrate how the ALJ and Appeals council erred, I recommend that this argument be rejected because it lacks merit.

### 3. *Substantial Evidence Does Not Support the ALJ's Evaluation of Ms. Gentry's Subjective Complaints.*

Evaluating an individual's subjective symptoms is a two-step process. SSR 16-3p, 2017 WL 5180304, at *3. First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Then, the ALJ must evaluate the intensity and persistence of the individual's symptoms and determine the extent to which they limit the individual's ability to perform work-related activities. *Id*.

At the second step, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources (such as family and friends). *Id*. An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including the daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id*. An ALJ is not required to accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F. 3d 469, 476 (6th Cir. 2003), and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496,

508 (6th Cir. 2006). But the regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); see also SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ does not need to use any "magic words," so long as it clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's evaluation of subjective evidence receives great deference from a reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints, and the conclusions drawn from it. *Id*. (internal quotations and citations omitted).

In the ALJ's remand decision, the ALJ considered Ms. Gentry's allegations, including her complaints of pain, and concluded that the evidence did not fully support these allegations. (Tr. 114-17.) Upon review, the Appeals Council determined that the ALJ's decision did not adequately evaluate Ms. Gentry's subjective complaints and supplemented the ALJ's analysis. After evaluating the evidence related to Ms. Gentry's COPD (Tr. 7) and substance abuse and substance-induced psychotic disorders (Tr. 7-8) and the medical opinion evidence (Tr. 8-10), the Appeals Council found that the ALJ's decision "adequately shows the objective medical evidence supports the physical RFC." (Tr. 10.)

The Appeals Council provided valid reasoning to bolster this conclusion. For example, the Appeals Council noted Ms. Gentry's submaximal effort at her functional evaluation and inconsistent exam findings, including that her heart rate was noted to not increase in a relational

31

manner to her subjective complaints of pain. (Tr. 10-11; *see* Tr. 1394.) The Appeals Council also observed inconsistencies in Ms. Gentry's own testimony. Notably, Ms. Gentry asserted that she stopped going for treatment due to lack of finances, but she also testified that she had health insurance. (Tr. 11; *see* Tr. 167.) The Appeals Council even addressed Ms. Gentry's arguments raised in her request for review related to difficulties with repetitive use of her arms, COPD, and mental impairment-related symptoms. (Tr. 10-11.)

Ms. Gentry argues that the ALJ and the Appeals Council did not adequately consider her complaints of disabling pain. (ECF No. 8, PageID#2273-80.) In support of this argument, Ms. Gentry provides a five-page broad recitation of the medical record that, in her interpretation, would substantiate her allegations, and she then asserts that Appeals Council's rationale was unsupported, contradictory, and erroneous. (*Id.* at PageID#2279-80.) But it is not a reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Dowdell v. Comm'r of Soc. Sec.*, No. 1:22-CV-01348-JRA, 2023 WL 4708124, at *11 (N.D. Ohio June 29, 2023), *report and recommendation adopted*, 2023 WL 4706726 (N.D. Ohio July 24, 2023). "Even if evidence could support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion." *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). The Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d at 545 (6th Cir. 1986) (citing *Baker*, 730 F.2d at 1150).

Ms. Gentry, represented by counsel, fails to address any of the rationale from the decisions of the ALJ and the Appeals Council. She does not offer any explanation as to what evidence the ALJ failed to address or would undermine the ALJ's finding that she could perform work at the light exertional level. It is not enough for Ms. Gentry to merely recite evidence that supports her

interpretation of the medical evidence and conclude that the ALJ's decision was erroneous. Instead, she bears the burden to demonstrate that no reasonable person could have reached a different conclusion. *Fleischer*, 774 F.Supp.2d 875. Because Ms. Gentry does not establish error with respect to the SSR 16-3p analysis, I recommend that the Court reject this assignment of error because it lacks merit.

## VII.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: January 8, 2024

s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VIII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also

receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).